UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI

PANERA, LLC,

          Plaintiff,

          v.

MICHAEL R. NETTLES, and PAPA JOHN'S INTERNATIONAL, INC.,

          Defendants.

Case No.: 16-1181

JURY TRIAL DEMANDED

## COMPLAINT OF PANERA, LLC
### (INJUNCTIVE RELIEF REQUESTED)

### INTRODUCTION

Panera, LLC brings this action against its former employee, Michael Nettles, and his current employer, Papa John's International, Inc., seeking injunctive relief and damages to redress the breach of Nettles' confidentiality and non-competition agreement[1], and both Defendants' use of Panera's confidential and proprietary information and trade secrets. In sum, Panera's very right to compete fairly in the market place is threatened.

While employed by Panera, Nettles worked in a high-level executive position within Panera's Information Technology department. In that role, Panera granted Nettles access to its highly-sensitive confidential and proprietary information and trade secrets. This information includes, but is not limited to, Panera's thought processes and visions for its technology systems, architectural drawings and specifications for all of its master technology systems, and all

---

[1] During his employment with Panera, Nettles executed a Confidential and Proprietary Information and Non-Competition Agreement (the "Agreement"), a true and accurate copy of which is attached as Exhibit 3 to the Affidavit of Panera's CEO, Ron Shaich, which is filed herewith as Exhibit 1. The Affidavit of John Meister is filed herewith as Exhibit 2. The Affidavit of Jakob Wahlberg is filed herewith as Exhibit 3. These affidavits are all filed in support of Panera's Complaint and request for injunctive relief.

schematics, notes and confidential and proprietary plans and processes used in the development of technology systems to support and drive the company.  Allowing Nettles to use this confidential information for the benefit of Papa John's provides Papa John's with an unfair competitive advantage, and would allow Nettles to unlawfully compete with Panera.  And to allow such conduct would fly directly in the face of the clear, reasonable, and valid Agreement that Nettles voluntarily signed, wherein he agreed not to compete with Panera for a one-year period following the end of his employment there.

If Nettles is allowed to simply ignore the terms of his Agreement, not only will Panera suffer irreparable harm caused by his conduct, Panera has an increased risk that other key members of its high-level executive team will ignore their valid agreements with Panera, imperiling its hard-earned ability to compete and protect its confidential and proprietary information and trade secrets in the fast-paced food service industry.  We ask that this Court put an end to Nettles' direct attempt to violate his clear contractual Agreement with Panera, and to Papa John's attempt to unlawfully employ Nettles in an effort to gain Panera's confidential information, including but not limited to, Panera's strategic plans and though processes relating to its proprietary technology systems.

In addition to injunctive relief, Panera also seeks damages, attorneys' fees and costs, and any other such relief as this Court deems just and proper.

## PARTIES

1.      Plaintiff Panera, LLC is a Delaware limited liability company having its principal place of business at 3630 South Geyer Road, Suite 100, St. Louis, Missouri.  Panera, LLC is a wholly owned subsidiary of Panera Bread Company.

2.      Defendant Michael R. Nettles is an individual who, upon information and belief, currently resides in or near Louisville, Kentucky, in order to begin employment with Defendant

2

Papa John's International, Inc. on July 18, 2016, at its headquarters, which are located in Louisville, Kentucky.  Before moving to Kentucky, Nettles was a resident of Wildwood, Missouri.

3. Upon information and belief, Defendant Papa John's International, Inc. is a Delaware corporation having its principal place of business at 2002 Papa John's Boulevard, Louisville, Kentucky.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1332(a), because Panera is a citizen of Missouri, Nettles and Papa John's are citizens of Kentucky, and the amount in controversy exceeds $75,000.

5. In addition, this Court has subject matter jurisdiction over this action by virtue of 18 U.S.C. § 1836(b), because Panera brings a claim of Defendants' violation of federal law pursuant to the Defend Trade Secrets Act ("DTSA").

6. This Court has personal jurisdiction over Nettles pursuant to Mo. Rev. Stat. § 506.500.1(2) because he engaged in conduct in Missouri giving rise to the facts and circumstances at issue in this lawsuit, and has sufficient minimum contacts with Missouri to satisfy any due process concerns.

7. This Court has personal jurisdiction over Papa John's pursuant to Mo. Rev. Stat. § 506.500.1(1)-(3) because it transacts business within Missouri, and has sufficient minimum contacts with Missouri to satisfy any due process concerns.

8. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Panera's claims occurred in this District, and by virtue of § 15.1 of the Agreement between Panera and Nettles.

## BACKGROUND FACTS

### Panera History and Development

9. In 1981, Au Bon Pain Company, Inc. was founded by Panera's current Chief Executive Officer, Ron Shaich, and a partner. Au Bon Pain Company, Inc. later acquired the St. Louis Bread Company (a regional chain of 20 bakery-cafes located in the St. Louis, Missouri area), and – eventually – morphed into the Panera customers know today.

10. Currently, Panera is one of the largest food service companies in the United States, with over 2,000 branded restaurants throughout the United States and Canada serving over 10 million people per week.

11. Panera sells made-to-order sandwiches, tossed-to-order salads, soups, freshly baked breads, and other food and bakery items for dining-in, carry-out and for delivery.

12. Panera's bakery-cafes are located in urban, suburban, strip mall, and regional mall locations. Panera features high-quality food in a warm, inviting, and comfortable environment.

### Panera's Commitment to and Development of its Digital and Technological Systems

13. Panera is a leader in the food service industry in integrating technology into its customers' experience, and has developed a clear vision as to how it will capitalize on technology to continue to stay at the top of the industry over the next five years and beyond.

14. Panera prides itself on being several steps ahead of the game in developing its technological systems, which ultimately drives a guest's experience with Panera.

15. For example, in approximately 2011, Panera unveiled its vision for "Panera 2.0," which consists of enhanced to-go and eat-in options enabled by a series of integrated technologies. "Panera 2.0" is an integrated, comprehensive, end-to-end solution that aims to reduce wait times, improve order accuracy, and minimize or eliminate crowding; and create a more personalized experience.

16. "Panera 2.0" enables Panera to keep up with high transaction volumes and unrestrained production demands, and thus has enhanced the guest experience.

17. Panera made substantial investments initiating and implementing various digital and technology strategies and systems, including systems for digital ordering, digital payment, enhance technology-based kitchen display systems and food production systems, digitally-based cafe management systems, master data management systems and quality assurance systems.

18. Essentially, Panera believes that technology is a core competitive advantage and differentiator in the restaurant business, and Panera has become a leader in technology that is devoted to improving customer service and providing greater access and convenience.

19. Panera understands that in order to continue to succeed and appeal to customers in such a competitive industry, it must have talented employees who can implement its clear vision for the future. In that regard, Panera has focused on hiring and developing talented individuals who can grow to understand Panera's clear vision and implement its processes. Nettles is one of those individuals that Panera identified as capable of taking Panera's vision for the future and implementing it in a way so that customers will tangibly reap the benefits.

Panera Hires Nettles

20. In June 2012, Panera extended an offer to Nettles to work as Panera's Vice President of Architecture in its Information Technology department.

21. In short, Nettles served as a vice president in Panera's Information Technology department from the time he began working for the Company in July 2012 through July 1, 2016. In his various roles during that time period, Nettles had privileged access to Panera's most highly proprietary technology-based initiatives.

22. Nettles proved to be a critical leader in Panera's IT department and was invited to join many of Panera's high-level discussions relating to its strategies as it relates to use of

technology. In fact, Nettles participated in Panera's highest-level discussions regarding its vision for using technology over the next two to four years and how Panera plans to remain competitive.

23. Over the past four years, Nettles was involved in every aspect of developing Panera's technology systems.

24. Given the important role Nettles played in implementing these programs, he was also privy to all of Panera's high-level discussions concerning its vision for how to continue to use technology to its advantage in the future. In other words, Nettles intimately knows Panera's strategic technology plan for the next few years.

25. Panera is a leader in the restaurant industry regarding its use of technology, and Panera's competitors are constantly trying to replicate Panera's technology systems as well as poach its employees. If a competitor was able to hire someone like Nettles, they would have inside information into Panera's specific plans and strategies regarding its implementation of highly proprietary technology-driven initiatives that focus on improving the customer experience.

<u>Panera Seeks To Protect Its Proprietary Information</u>

26. As it does with all employees who are exposed to Panera's confidential and proprietary information and trade secrets in the way that Nettles was, Panera required Nettles to sign a confidentiality and non-competition agreement as a condition of his employment.

27. Nettles signed a confidentiality and non-competition agreement as a condition of beginning his employment with Panera in 2012.

28. Attached to the confidentiality and non-competition agreement that Panera asks a limited number of high-level executives to sign is a list of specific competitors that Panera

identified and for whom Panera's employees cannot work for a certain period of time depending on the employees' level within the Company.

29. On or around July 24, 2013, Nettles signed a revised Confidential and Proprietary and Non-Competition Agreement (the "Agreement").

30. By policy, Panera will not hire or retain employees at Nettles' level if they are unwilling to sign Panera's non-competition and confidentiality agreement.

31. Only a limited number of employees are required to sign the non-competition agreement and the duration of the non-competition agreement varies by the employee's level.

32. In order to protect Panera's intellectual property and confidential and proprietary information from exposure to competitors, Nettles as a vice president had to sign Panera's non-competition and confidentiality agreement to secure and continue his employment with Panera and to receive certain equity awards. He did so voluntarily.

### Nettles Leaves Panera To Work For Papa John's in Direct Breach of the Agreement

33. Upon information and belief, in June 2016, Papa John's extended an offer to Nettles to join the company.

34. Upon information and belief, Papa John's was aware that Nettles had signed a non-competition agreement with Panera that would forbid him from working for Papa John's, but Papa John's pursued Nettles and extended the offer anyway.

35. On June 8, 2016, Nettles sent Ron Shaich, CEO of Panera, a lengthy email stating that he wanted to accept a job offer from Papa John's, and asking Mr. Shaich to release him from the non-compete agreement so that he could take the job. Nettles expressed a desire to move to Kentucky where he could begin a new chapter in his life.

36. Mr. Shaich informed Nettles that he could not do so here because he had a responsibility to Panera shareholders, franchisees and employees to protect Panera's confidential information and ways of thinking.

37. Instead, sympathetic to Nettles' desire to start fresh in a new location, Mr. Shaich offered to help Nettles find another job as long as he would not be working for a competitor identified in the non-competition agreement. Nettles never took Mr. Shaich up on his offer.

38. Instead, nearly a month later, Nettles gave Panera notice of his intent to resign and accept the senior level position at Papa John's.

39. Upon information and belief, Papa John's was aware that Panera declined to release Nettles from his non-competition agreement, but Papa John's did not withdraw its offer for employment. Instead, upon information and belief, Papa John's encouraged Nettles to begin work for Papa John's immediately and leave Panera with no other choice but to bring this lawsuit.

<u>Panera and Papa John's Are Direct Competitors</u>

40. Papa John's competes with Panera in a number of respects.

41. Papa John's and Panera compete with each other as a "food alternative." Both Papa John's and Panera fight for customers during the lunch and dinner hours. Additionally, both focus specifically on selling products made from dough, and they both place an emphasis on using the freshest, high-quality ingredients and on eliminating ingredients containing artificial colors, flavors, sweeteners or preservatives from their products.

42. In fact, Papa John's consistently compared itself to Panera in that respect, and created an internal "Clean Label Scorecard" to gauge its efforts in clean-eating against Panera and Chipotle.

43. Papa John's competes with Panera in creating the ultimate customer experience. Specifically, both restaurants seek to provide a guest experience that is enabled by technology – both with respect to the experience of the customers at the counter, and also behind-the-scenes operational procedures that ultimately create a better customer experience.

44. Papa John's competes with Panera in the restaurant technology space.  Panera is the leader in the industry with regard to technology, and Papa John's has been targeting Panera's IT group for some time now in order to access the strategy and thinking behind Panera's technology systems.

45. Papa John's competes with Panera in the small order delivery and the catering market.  Delivery is one of Panera's largest initiatives. Panera is a fast-growing small order delivery company and the largest non-pizza e-commerce provider in the restaurant industry.

46. Upon information and belief, Papa John's specifically hired Nettles to drive their technology vision and overall strategy, and share with Papa John's how Panera is competing (and intends to compete in the future) with regard to: its use of technology to enhance guest experience, its successes in the delivery business, and its use of powerful and integrated systems and processes.

**Nettles is Engaged in Competitive Activity
<u>in a Willful and Continuing Breach of his Agreement</u>**

47. Upon information and belief, Nettles began working at Papa John's on Monday, July 18, 2016.  This is in direct breach of the Agreement that he signed with Panera, and of which he is well-aware of the terms.

48. Upon information and belief, Nettles intends to or will inevitably utilize Panera's confidential information and trade secrets in performing his work for Papa John's in violation of his Agreement with and obligations to Panera.

## Nettles Misappropriates Panera's
## Confidential Information and Trade Secrets

49. Upon information and belief, Nettles used his personal laptop and devices to store Panera's confidential and proprietary information.

50. Panera requested that Nettles turn over his personal devices so that Panera could confirm that all confidential and proprietary trade secrets that Nettles possessed had not been copied, transferred, and the like.

51. Nettles refused to allow Panera limited access to his personal devices and instead, upon information and belief, deleted all information relating to Panera from these devices.

52. Upon information and belief, Nettles created a back-up copy of all Panera-related documents before deleting them from his personal laptop and other devices.

53. Upon information and belief, Nettles may continue to have access to Panera's proprietary and confidential information, which he may plan to share, if he has not already done so, with Papa John's.

## COUNT I – BREACH OF CONTRACT
### (Against Michael Nettles)

54. Panera realleges and incorporates by reference paragraphs 1 through 53 of the Complaint.

55. Nettles entered into a binding Agreement with Panera.

56. Nettles' Agreement contains a valid and enforceable non-competition covenant, pursuant to which he agreed that, during his employment and for a period of time following termination of his employment with Panera, he would not work for Papa John's.

57. Upon information and belief, as of July 18, 2016, Nettles will be working for Papa John's, a Listed Competitor on Attachment A to the Agreement.

58. Nettles' Agreement contains valid and enforceable duty of confidentiality covenants, pursuant to which he agreed that, during his employment and following termination of his employment with Panera, he would not directly or indirectly divulge or otherwise make any use of Panera's confidential information or trade secrets.

59. Nettles further agreed to return to Panera all confidential and proprietary information he stored on his personal devices.

60. Panera performed its obligations to Nettles.

61. Nettles breached his Agreement by becoming employed by Papa John's.

62. Nettles breached his Agreement by failing to turn over all proprietary and confidential information stored on his personal devices.

63. Upon information and belief, Nettles will breach his Agreement by disclosing Panera's confidential information and trade secrets.

64. Panera is damaged and will continue to be damaged and irreparably harmed as a result of Nettles' breach of his Agreement.

COUNT II – TORTIOUS INTERFERENCE
WITH CONTRACTUAL RELATIONS
(Against Papa John's)

65. Panera realleges and incorporates by reference paragraphs 1 through 64 of the Complaint.

66. The Agreement Nettles signed was a binding contract between Nettles and Panera.

67. Upon information and belief, Papa John's had actual notice of both the existence and terms of this contract.

68.     Upon information and belief, Papa John's has knowingly and willfully interfered with Panera's contractual relations with Nettles by engaging in conduct designed to induce Nettles into breaching his contract with Panera.

69.     Papa John's interference with Panera's contract with Nettles was improper in motive or means.

70.     Panera is damaged and will continue to be damaged and irreparably harmed as a result of Papa John's tortious interference.

<u>**COUNT III – DEFEND TRADE SECRETS ACT (18 U.S.C. § 1839)**</u>
**(Against Michael Nettles and Papa John's)**

71.     Panera realleges and incorporates by reference paragraphs 1 through 70 of the Complaint.

72.     Aspects of Panera's technology-driven initiatives and strategies constitute protectable trade secrets.

73.     The process behind developing and implementing Panera's technology-driven initiatives is not readily ascertainable through proper means.

74.     Panera has derived actual economic value from these programs that have put Panera ahead of its competitors in reaching customers through technology, and expects to continue to derive further value as Panera continues to roll them out.

75.     Panera took reasonable steps to protect these trade secrets, including by instituting confidentiality policies and having high-level employees agree to non-competition agreements and confidentiality and proprietary information agreements, sharing these trade secrets with a limited, restricted group of leadership executives, and labeling certain documents as proprietary and confidential.

76. These technology-driven initiatives are important to Panera's business strategy, and if the information behind how these initiatives were developed, tested, and implemented becomes generally known to Panera's competitors, Panera stands to suffer irreparable harm.

77. Nettles possesses the intimate knowledge to facilitate Papa John's ability to copy Panera's protectable trade secrets and benefit from the millions of dollars Panera has spent on these initiatives.

78. Upon information and belief, Nettles has retained confidential and proprietary information that he plans to share with Papa John's that will allow them to copy Panera's protectable trade secrets and benefit from the millions of dollars Panera has spent on these initiatives.

79. Panera has been harmed and will continue to be irreparably injured by Defendants' violation of this statute.

<u>COUNT IV – MISSOURI UNIFORM TRADE SECRETS ACT</u>
**(Against Michael Nettles and Papa John's)**

80. Panera realleges and incorporates by reference paragraphs 1 through 79 of the Petition.

81. Panera's technology-driven initiatives are central to Panera's vision for its continued future success over the coming years and to solidify itself as a leader in the restaurant industry with regard to innovative use of technology.

82. Panera's development, testing, implementation and execution of these technology initiatives are not known to its competitors, many of whom have attempted to mimic them without success, and this has created an economic and competitive advantage for Panera.

83. Panera has gone to great lengths to protect the processes behind these initiatives through patents, confidentiality agreements, and non-competition agreements with its most

involved employees. Only the highest-level employees are provided access to the information that Nettles has and is likely to share with Papa John's.

84. Upon information and belief, Papa John's values these trade secrets as they have consistently been pursuing Panera's employees in the IT department.

85. Defendants' misappropriation and use of Panera's trade secrets has caused and will continue to cause Panera irreparable harm, and entitles Panera to injunctive relief as provided by Mo. Rev. Stat. § 417.455 (2013).

## COUNT V – VIOLATION OF THE MISSOURI COMPUTER TAMPERING ACT
**(Against Michael Nettles)**

86. Panera realleges and incorporates by reference paragraphs 1 through 85 of the Complaint.

87. Upon information and belief, Nettles removed from Panera's computer system confidential, proprietary and trade secret information and stored it on his personal devices.

88. At all times, Panera was the owner of the data that Nettles stored on his personal devices.

89. Upon information and belief, Nettles stored Panera's data on his personal Mac laptop and on Dropbox.

90. Upon information and belief, on or around July 1, 2016, before resigning from Panera, Nettles made a back-up copy of all of Panera's files stored on his personal Mac laptop and then imported that data to his Panera laptop. Nettles subsequently permanently deleted the original files stored on his personal Mac laptop. In doing this, Nettles, upon information and belief, intentionally altered or deleted the metadata associated with those transferred files such that Panera will be unable to determine the original dates of creation, transfer and access of its data.

91.     Upon information and belief, on or around July 1, 2016, before resigning from Panera, Nettles manually transferred files stored in a locally stored "Dropbox" folder to his Panera laptop. In doing this, Nettles, upon information and belief, intentionally altered or deleted metadata associated with those transferred files such that Panera will be unable to determine the original dates of creation, transfer and access of its data.

92.     Nettles was aware at all times that the actions he was taking were in direct violation and breach of the Agreement he signed with Panera.

93.     As a consequence and proximate result of Nettles' tampering with Panera's data, Panera has suffered and will continue to suffer pecuniary loss in the form of actual damages to be proven at trial, and any other costs the Court deems necessary and just.

### COUNT VI – CIVIL CONSPIRACY
**(Against Michael Nettles and Papa John's)**

94.     Panera realleges and incorporates by reference paragraphs 1 through 93 of the Complaint.

95.     As Vice President, IT Architecture Services, Nettles was intimately involved in many of Panera's highly proprietary technology initiatives, and was privy to Panera's specific vision for the coming years.

96.     Upon information and belief, Papa John's was aware of the intimate knowledge and involvement Nettles had in developing Panera's trade secrets in the technology space.

97.     Upon information and belief, Papa John's knew that Nettles had signed the Agreement whereby he could not share confidential information with a competitor or work for Papa John's for a certain time from the date of his resignation.

98.     Upon information and belief, Papa John's has conspired with Nettles to breach the Agreement he has with Panera, which will inevitably lead to the misappropriation of Panera's confidential trade secrets.

99.     Nettles stored Panera's confidential information on his personal devices, has refused to turn over those devices for inspection, and upon information and belief, still has access to Panera's confidential information.

100.    Panera has been harmed and will continue to be irreparably injured by Papa John's and Nettles' concerted actions.

## PRAYERS FOR RELIEF

**WHEREFORE**, Panera LLC respectfully requests this Court to:

A.     Enter a preliminary injunction and, after trial, a permanent injunction, ordering Nettles to abide by the terms of the Agreement including, but not limited to:

(i)     Prohibiting Nettles immediately and for a period of one year from July 1, 2016, from directly or indirectly working for, advising, consulting or otherwise acting as an agent for Papa John's;

(ii)    Prohibiting Nettles from directly or indirectly using or disclosing Panera's confidential information; and

(iii)   Prohibiting Nettles from directly or indirectly divulging or otherwise making any use of Panera's confidential information or trade secrets;

B.     Enter a preliminary injunction and, after trial, a permanent injunction, ordering Nettles to certify, in writing, under the pains and penalties of perjury, that he has returned all of Panera's confidential and proprietary information and no longer has any of Panera's confidential and proprietary information in his possession, custody, or control;

C.     Enter a preliminary injunction and, after trial, a permanent injunction, ordering Papa John's to:

(i) Cease and desist from acting in concert with, engaging in, tolerating willfully, acquiescing in, or accepting Nettles' violation of his non-competition obligations to Panera;

(ii) Cease and desist from acting in concert with, engaging in, tolerating willfully, acquiescing in, or accepting Nettles' violation of his confidentiality obligations to Panera;

(iii) Cease and desist from directly or indirectly using or disclosing Panera's Confidential Information; and

(iv) Forfeit to Panera all profits or other monetary benefits it obtained from the use of Panera's Confidential Information;

D. Enter a preliminary injunction and, after trial, a permanent injunction, ordering both Defendants to:

(i) Return to Panera any and all Confidential Information in the custody, control, or possession of either Defendant including but not limited to, information relating to Panera's Scoring for Execution initiative; Panera 2.0 initiative; the back-of-the house and point-of-sale technology Panera uses at its bakery-cafes; the master data management systems Panera used to improve its customer experience; and any other technology initiatives that Panera plans to implement over the next two to four years;

(ii) Identify any Panera Confidential Information that has been disclosed by anyone and the names of any individual to whom such disclosure was made; and

(iii) Preserve and retain all documents and electronically stored information potentially relevant to the claims raised in Panera's Petition;

E. Enter a judgment against Nettles and Papa John's and in favor of Panera on all Counts;

F. Award Panera its costs and reasonable attorneys' fees; and

G. Award such other and further relief as may appear just and proper.

## JURY DEMAND

The Plaintiff, Panera, LLC, hereby requests a trial by jury on all issues so triable.

17

Respectfully Submitted,

**PANERA, LLC**

By its attorneys:

/s/      *Jessica L. Liss*
Bret A. Cohen, Esq. (MO Bar # 42368)
(*pro hac vice admission pending*)
Amanda B. Carozza, Esq.
(*pro hac vice admission pending*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
    AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241
bacohen@mintz.com
acarozza@mintz.com

Jessica L. Liss, Esq. (MO Bar # 51331)
Carrie L. Kinsella, Esq. (MO Bar # 65469)
Jackson Lewis P.C.
7733 Forsyth Blvd., Suite 600
St. Louis, Missouri 63105
Telephone: (314) 827-3939
Facsimile: (314) 827-3940
jessica.liss@jacksonlewis.com
carrie.kinsella@jacksonlewis.com

Dated: July 19, 2016

## CERTIFICATE OF SERVICE

      I, the undersigned, hereby certify that on July 19, 2016, I filed the Complaint of Panera, LLC using the Court's CM/ECF system, which will be served upon Defendants.

                                                /s/     *Jessica L. Liss*
                                                Jessica L. Liss, Esq.